# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SAKE TN, LLC, and SEANACHE HOMES, INC., *for themselves and all others similarly situated*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:21-cv-00108 |
| | ) | Judge Aleta A. Trauger |
| PATRICK MOSS, IRA INNOVATIONS, LLC, MARY M. WESTER, *individually and as Trustee of the Mary M. Wester Revocable Trust*, ALYCIA WHITE, *as Executrix of the Estate of William J. Gulas*, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Before the court is the plaintiffs' Motion for Class Certification ("Motion") (Doc. No. 66). For the reasons set forth herein, the Motion will be denied.

## I. PROCEDURAL HISTORY

Plaintiff Seanache Homes, Inc. ("Seanache"), alone, initiated this lawsuit in the Davidson County Chancery Court in October 2020, asserting state law claims against twenty-four individuals and entities. (Doc. No. 1-2.) Seanache resolved its claims with thirteen defendants, and the state court dismissed the claims against them. (Agreed Order of Compromise and Dismissal, Doc. No. 1-6.) In February 2021, Seanache, together with "Sake, LLC" (since identified as Sake TN, LLC ("Sake")), filed a First Amended Complaint "for themselves and all others similarly situated" against the remaining eleven defendants, asserting the same state law claims and adding federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (Doc. No. 1-14.)

The defendants collectively[1] removed the action to federal court on the basis of federal question jurisdiction. (Doc. No. 1.) In July 2021, the plaintiffs filed a substantively similar Second Amended Complaint ("SAC") (Doc. No. 20), substituting for Bill Gulas, who had died, Alycia White, as the executrix of his estate (SAC at 1, ¶ 14).

Defendants IRA Innovations, LLC ("IRA Innovations") and Mike Todd moved to dismiss the claims against them under Rule 12(b)(6). (Doc. No. 36.) The court granted the motion as to Todd, dismissed him from this action, and denied the motion as to IRA Innovations. (Doc. No. 51.) In May 2022, upon joint motion, the court dismissed with prejudice all claims against defendants Trey Cain; Kali Cain; Cain & Associates, PLLC; Knox Valley Partners, LLC; Morris Family Holdings, LLC; and Tennessee Title & Escrow Affiliates, LLC. (Doc. No. 59 (granting Doc. No. 57).) Four defendants remain: Patrick Moss; IRA Innovations; Mary M. Wester, individually and as Trustee of the Mary M. Wester Revocable Trust (collectively, "Wester)"; and Alycia White, as executrix of the estate of William J. Gulas ("White").[2]

---

[1] Defense counsel for ten defendants represented that the eleventh defendant, Bill Gulas, died before removal, without being served. (Doc. No. 1 at 1 n.1.)

[2] The parties who have filed motions in this matter have made inconsistent statements concerning who they understand to be parties to this action. As discussed above, since May 2022 there have been four defendants: Patrick Moss, IRA Innovations, Wester, and White.

In the Third Joint Motion to Modify Case Management Order, filed in December 2022, "[a]ll remaining parties, Plaintiffs and Defendants, by and through their undersigned counsel," requested a modification of deadlines related to both the Motion to Certify and otherwise, including, for example, a new deadline for motions for summary judgment. (Doc. No. 82 at 1, 3.) But only attorneys for the plaintiffs and IRA Innovations and Wester—two of the remaining four defendants—signed it. (*Id.* at 6 .) The same is true for many other such motions to amend deadlines. (*See, e.g.*, Doc. Nos. 89, 91, 95, 98, 101.) The tenth Joint Motion makes it explicit. (*See* Doc. No. 107 at 1 ("Plaintiffs . . . and the remaining Defendants, IRA Innovations . . . and . . . Wester . . . hereby jointly move this Honorable Court to modify its existing Case Management Order.").) A subsequent motion to amend deadlines, however, includes Patrick Moss among the defendants. (Doc. No. 113 at 1; *see id.* ¶ 5 ("Plaintiffs' counsel, IRA's counsel, and Wester's counsel were under the mistaken impression that they were the only remaining parties.").) And counsel for Moss has signed, with counsel for IRA Innovations and Wester, a motion for an extension sought by "Defendants by and through their attorneys." (Doc. No. 126 at 1, 3–4.) That same motion, however,

In October 2022, the plaintiffs filed a Motion for Class Certification (Doc. No. 66) and an accompanying Memorandum (Doc. No. 67). The defendants soon thereafter filed, under seal, the expert witness report of Arun Sharma ("Sharma Rep.") (Doc. No. 79-1). Over the next few years, the court granted many motions to amend deadlines, and the parties engaged in discovery. With leave, in June 2025 the plaintiffs filed a Supplemental Brief in support of their Motion. (Doc. No. 125.) The plaintiffs state that "Moss is not the subject of the putative class claims, as he has only made one usurious loan, as far as Plaintiffs can tell." (Doc. No. 67 at 2.) And the plaintiffs exclude White from their definition of "Class Defendants." (*See* Doc. No. 66 at 1–2.) The defendants do not address this issue, so neither will the court. Thus, IRA Innovations and Wester are referred to herein collectively as the "Class Defendants." Defendants Moss (even though he is excluded from the class allegations), IRA Innovations, and Wester filed a Response in opposition to the Motion (Doc. No. 128.) The plaintiffs did not file a reply brief or an expert report.

---

is also signed by counsel for Tennessee Title & Escrow Affiliates, LLC (*id.* at 4), which had not been a party since the court granted the plaintiffs' motion to dismiss it from the action more than three years earlier. (Doc. No. 59.)

As for defendant White, the record does not reflect that she has been served, is represented by counsel, or has filed anything in this action. And the other parties to this action, at times, appear not to consider her a defendant. The plaintiffs represented that they attempted five times to serve Gulas but were unsuccessful because of his hospitalization and death. (Doc. No. 25 at 1–2.) The court granted the plaintiffs' motion for an extension, until October 20, 2021, to serve White, whom the plaintiffs had substituted for Gulas in the SAC. (Doc. No. 34.) The plaintiffs represented that, as of the July 26, 2021 Motion for Extension of Time to Serve White, they were "in the process of getting Ms. White served by a private process server in Alabama." (Doc. No. 25 at 2.) In the intervening four years, the plaintiffs have not filed proof of service or White's waiver of service. Rule 4(m) provides that, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m); *see also Breezley v. Hamilton Cnty.*, 674 F. App'x 502, 505 (6th Cir. 2017) ("Under Rule 4, if a defendant is not timely served, the court may dismiss the action against that defendant."). Accordingly, the court will order that, within seven days of the date of the Order, the plaintiffs must file proof with the court that White has either waived service or been served, or else the court will dismiss the claims against White.

3

## II.    FACTS

According to the SAC, plaintiff Seanache is a real estate developer that "primarily" funds its projects through loans. (SAC ¶ 23.) Seanache "assigned some of the claims" in the SAC to plaintiff Sake pursuant to an assignment agreement that the plaintiffs have not filed with the court and do not otherwise discuss. (*Id.* ¶ 1.) Nor do the plaintiffs state which claims Seanache has assigned to Sake. The SAC alleges a scheme among the defendants, many of whom have since been dismissed, to charge usurious interest and loan charges prohibited by Tennessee law. The plaintiffs claim that the class members are entitled to recovery under Tenn. Code Ann. § 47-14-114, which provides that a borrower may recover "loan charges, commitment fees, or brokerage commissions in excess of those authorized . . . by action brought by the person paying such excess amounts."[3] (*Id.* ¶ 59.) The plaintiffs seek damages for intentional usury under Tenn. Code Ann. 47-14-117(c)(1). (*Id.* ¶ 60.) An allegation that a loan is usurious depends on Tenn. Code Ann. § 47-14-103, which enumerates three categories of transactions, each with its own maximum interest rate. The plaintiffs do not explicitly state which subdivision of subsection 103 applies, but, because they refer to "a Maximum Effective Formula Rate" (Doc. No. 67 at 2), the court infers that subsection 2 applies.[4] The "formula rate" is, in relevant part, "an annual rate of interest four (4) percentage points above the average prime loan rate (or the average short-term business loan rate,

---

[3] The plaintiffs do not address Tenn. Code Ann. § 47-14-111, which provides a cause of action for "usury," defined as the "collection of interest in excess of the maximum amounts authorized," which the statute distinguishes from "loan charges, brokerage commissions, or commitment fees." *See* Tenn. Code Ann. 47-14-102(4), (5), (8), (9), (12). The SAC alleges that the defendants charged *both* "usurious/illegal interest *and* excessive loan charges" (SAC ¶ 45; *see also id.* ¶¶ 59, 72.)

[4] Subsection 1 refers to maximum rates fixed by statute by category of lender, and subsection 3 sets a 10% maximum rate for all other transactions. The plaintiffs do not allege facts that support the application of either of these provisions. By contrast, Section 103(2) provides that the maximum effective rate of interest is, "[f]or all written contracts . . . not subject to subdivision (1), the applicable formula rate." Tenn. Code Ann. § 47-14-103(2).

4

however denominated) for the most recent week for which such an average rate has been published by the board of governors of the Federal Reserve System, or twenty-four percent (24%) per annum, whichever is less." Tenn. Code Ann. § 47-14-102(7). Section 47-14-102(3) provides that the "applicable formula rate" at any given time is the greater of:

> (A) The "formula rate" in effect at such time; or
> (B) The "formula rate" last published in the Tennessee Administrative Register prior to such time, pursuant to § 47-14-105.

Section 47-14-105, in turn, requires the Tennessee Administrative Register to publish the formula rate. The defendants refer the court to the website of the Tennessee Department of Financial Institutions (Doc. No. 128 at 26), of which this court takes judicial notice. The Department of Financial Institutions has provided the formula rate, "[a]s [d]etermined [p]ursuant to T.C.A. § 47-14-105," for most weeks, if not every week, since 2009. Tenn. Dep't of Fin. Insts., "Historical Listing of Formula Rates." https://www.tn.gov/content/tn/tdfi/tdfi-how-do-i/info/formula-rate/formula-rate-history.html (last visited Sept. 17, 2025) [https://perma.cc/9VRN-VW3V]. What this means, therefore, is that whether a particular promissory note's interest rate exceeded that permitted by Tennessee law, when it was executed, depends on the week it was issued. There are however, long periods during which the formula rate does not change; for example, the formula rate for each week of 2025 through September 16, was 11.50%. (*Id.*)

The alleged scheme began when Seanache's president, Richard Potts, met Trey Cain, who was conducting a closing through his title company, Tennessee Title, that involved Seanache. (SAC ¶ 24.) After that introduction, Cain offered to "find investors to loan Seanache money for development and construction projects," to provide legal representation to Potts and Seanache through Cain's law firm, Cain & Associates, and to perform the closings on loans and real estate purchases through Tennessee Title. (*Id.* ¶ 25.) Through this alleged scheme, Cain brought Seanache lenders; his law firm drafted the loan documents, including promissory notes; his title

company performed the closings; the law firm and title company received various fees; and the lenders benefitted from payments on the unlawful interest rates, including by charging extra interest disguised as "transaction funding fees." (*Id.* ¶¶ 25, 29–30.)

For example, defendant Wester loaned Seanache funds to purchase real property at 2410 Porter Road ("Porter Property") in October 2015, pursuant to a promissory note indicating an interest rate of 15% per annum plus a 3% transaction funding fee. (*Id.* ¶ 42; *see also* Doc. No. 20-9 at 1.) Because of the loan's 120-day term, the plaintiffs calculate the actual rate of interest rate on this loan to be 21% per annum. (SAC ¶ 42.) At the closing in May 2016, however, Seanache allegedly paid Wester $23,3111.59 in interest, which the plaintiffs estimate to have been an effective rate of 23.62% per annum, which is higher than both the rate upon which they had agreed, and the legal limit. (*Id.* ¶ 43; *see also* Doc. No. 67-4 at 5 (listing Wester, according to the plaintiffs, as the "First Mortgage Loan" lender).) The promissory note includes a choice of law provision specifying that Tennessee law applies. (Doc. No. 20-9 at 2.) And the promissory note includes what the plaintiffs refer to as a "usury saving provision" (*see* Doc. No. 125 at 14), according to which the lender agrees to repay interest collected in excess of the legal limit. (Doc. No. 20-9 at 1.) According to the plaintiffs, the defendants who were lenders "included specific language in the promissory notes that attempted to avoid legal liability for such illegal interest." (SAC ¶ 53.) The plaintiffs allege that all of the promissory notes for the transactions listed in the SAC "were usurious on their face," that the defendants, collectively, "are in the business of making usurious loans," and that the defendants conspired with each other and, "[i]n addition . . . with many other persons to violate the usury laws." (*Id.* ¶¶ 55–57.)

The plaintiffs allege that the defendants operated an "association-in-fact enterprise," with Cain as its leader, to profit from the collection of unlawful debt from Seanache. (*Id.* ¶ 47.) In the

alternative, they allege that each group of "series lenders," along with Cain and his entities, constitute an "association-in-fact enterprise," the purpose of which was to collect unlawful debt. (*Id.* ¶ 48.) In the alternative, the plaintiffs allege that the LLC defendants are "association-in-fact enterprises, consisting of the entity and its members, along with Mr. Cain and his entities." (*id.* ¶ 49.) Further, the plaintiffs allege that the "'series lenders' were partnerships or joint ventures between the various Defendants that also constituted association-in-fact enterprises along with Mr. Cain and his entities." (*Id.*)

The SAC seeks relief based on twenty-two allegedly usurious loans Seanache executed according to the alleged scheme, as enumerated in paragraph 36 of the SAC and supported by exhibits attached thereto. Under paragraph 36 of the SAC, the plaintiffs list twenty-two specific loans by property address, the lenders' names, the "series" name (if applicable), and the exhibit number to the SAC under which the loan documents in the plaintiffs' possession for each transaction may be found. Many of the twenty-two loans were made by former defendants. Three of the remaining defendants—IRA Innovations, Wester, and Patrick Moss—are alleged usurious lenders who executed promissory notes. (*Id.* ¶¶ 36, 39.) Bill Gulas was a member of, and the "Owner and Operator of," IRA Innovations. (*Id.* ¶ 14.) White is the executrix of his estate. (*Id.*)

Based on the foregoing allegations, the SAC asserts claims on behalf of the plaintiffs and a class of others similarly situated[5] for (1) usury and excessive loan charges in violation of Tenn. Code Ann. § 47-14-114 (SAC ¶¶ 58–60, Count One); (2) engaging in the conduct of an enterprise or multiple enterprises to collect unlawful debt, as defined by 18 U.S.C. § 1961, in violation of RICO, 18 U.S.C. § 1962(c) (*id.* ¶¶ 61–70, Count Two); civil conspiracy to collect usurious interest

---

[5] The Motion to Certify Class requests certification of three subclasses, which the court discusses below.

(*id.* ¶¶ 71–76, Count Three); RICO conspiracy to violate 18 U.S.C. § 1962(c) (*id.* ¶¶ 77–81, Count Four); breach of contract, specifically the provisions in promissory notes requiring repayment of unlawful interest (*id.* ¶¶ 82–86, Count Five); breach of fiduciary duty against Cain individually (*id.* ¶¶ 87–90, Count Six); and unjust enrichment against IRA Innovations and Morris Family Holdings related to the closing of the Porter Property (*id.* ¶¶ 91–94, Count Seven). Count Eight purports to assert a class action. (*Id.* ¶¶ 95–99.)[6]

## III.  LEGAL STANDARDS

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano. v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  For the court to certify a class, the plaintiffs must meet the requirements set forth in Rule 23(a): numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. P. 23(a); *Pickett v. City of Cleveland*, 140 F.4th 300, 308 (6th Cir. 2025). In addition, Rule 23(b) provides that the proposed class must fit within at least one of the types of class actions it enumerates. Fed. R. Civ. P. 23(b); *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 278 (6th Cir. 2018). The party seeking class certification bears the burden to show that the requirements of Rule 23(a) and 23(b) have been met. *Pickett*, 140 F.4th at 314 (Gibbons, J., concurring). This burden is "not merely a pleading

---

[6] Some claims are asserted against "Defendants" (Count Two, Three, Four, Eight), one claim is asserted against Cain only (Count Six), one claim is asserted against "IRA Innovations and Morris Family Holdings" (Count Seven), and the two claims are alleged against "Lender Defendants." (Count One, Five.) The SAC first defines "Lender Defendants" as those entities that made usurious loans to Seanache: Knox Valley Partners, Morris Family Holdings, Wester Trust, IRA Innovations, and Patrick Moss. (SAC ¶ 39.) Then the SAC defines "Lender Defendants" to include roughly two dozen entities and individuals, including several who were never party to this lawsuit (*id.* ¶ 50), although some were identified as defendants in a lawsuit filed by Seanache in July 2019 and voluntarily dismissed in December 2019. *See Seanache Homes, Inc. v. Cain*, No. 3:19-cv-00625 (M.D. Tenn. July 22, 2019), ECF No. 1 (Complaint); *Seanache Homes, Inc. v. Cain*, No. 3:19-cv-00625 (M.D. Tenn. Dec. 5, 2019), ECF No. 78 (Notice of Voluntary Dismissal).

8

standard." *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 316 (6th Cir. 2025). Rather, the "plaintiffs must affirmatively 'prove' that the class meets the prerequisites for certification." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

The plaintiffs have "chosen Rule 23(b)(3) as the exclusive avenue for certifying their claims."[7] (Doc. No. 67 at 14.) Rule 23(b)(3) "allows class certification in a much wider set of circumstances" than (b)(1) or (b)(2), but this greater flexibility is constrained by "greater procedural protections." *Wal-Mart*, 564 U.S. at 362. A court may certify a class under Rule 23(b)(3) only if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

_____

[7] The plaintiffs misquote Rule 23(b)(3): "Rule 23(b)(3) requires that the court finds that 'the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." (Doc. No. 67 at 14 (purporting to quote Rule 23(b)(3)).) The plaintiffs' language was correct as recently as 2006; but Rule 23 was amended in 2007 to state, as it does now, that the court must find that "the questions of law or fact common to *class members* predominate over any questions affecting only individual members, and that a class action is superior to other available methods for *fairly and efficiently adjudicating* the controversy." *Contrast* Fed. R. Civ. P. 23(b)(3) (2006) ("questions of law or fact common to *the members of the class* predominate") (emphasis added), https://www.uscourts.gov/sites/default/files/federal_rules/FRCP12.1.2006.pdf [https://perma.cc/AR7D-ZDTF], *with* Fed. R. Civ. P. 23(b)(3) (2007) ("questions of law or fact common *to class members* predominate") (emphasis added), https://www.uscourts.gov/sites/default/files/federal_rules/FRCP12.1.2007.pdf [https://perma.cc/8K8Q-2WZD], *and* Fed. R. Civ. P. 23(b)(3). This is a minor error. The court infers that the error is attributable to the plaintiffs' reliance on a 2008 brief—from which they appear to have copied several paragraphs and repeated other errors—filed in a different case, in a different court, by different attorneys from a different firm. *See* Plaintiffs' Supplemental Memorandum in Support of Class Certification Pursuant to Rule 23(b)(3) at 34, *Boynton v. Headwaters, Inc.*, No. 1:02-cv-0111-JPM-egb (W.D. Tenn. June 9, 2008), ECF No. 567 ("Rule 23(b)(3) requires that . . . the court finds that the questions of law or fact common to *the members of the class* 'predominate' over any questions affecting only individual members, and that a class action is 'superior' to other available methods for the *fair and efficient adjudication* of the controversy.") (emphasis added).

In addition to *predominance* and *superiority*, "Rule 23(b)(3) classes must also meet an implied ascertainability requirement," which means that a "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 464 (6th Cir. 2020) (first quoting *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017), and then quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (internal quotation marks omitted)).

Whether a class may be certified is a separate question from whether the putative class will succeed on the merits. However, at times it may be "necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations and internal quotation marks omitted). In addition, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (citations and internal quotation marks omitted). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 351). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart*, 564 U.S. at 351). This rigorous analysis is not, however, a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). When the court considers a motion to certify a class under Rule 23(b)(3), as here, it "must conduct a 'rigorous analysis' to determine that 'damages are susceptible of measurement across the entire class.'" *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 621 (6th Cir. Aug. 13, 2025) (quoting *Comcast*, 569 U.S. at 35).

Further, "a class may be divided into subclasses that are each treated as a class" under Rule 23. Fed. R. Civ. P. 23(c)(5). The court must treat each subclass "as a class," so "each subclass must independently meet the requirements of Rule 23." *Speerly*, 143 F.4th at 322 (quoting 7A Wright & Miller, *Federal Practice and Procedure* § 1790 (3d ed. 2005)).

## IV. DISCUSSION

The plaintiffs ask the court to certify, under Rule 23(b)(3), three subclasses defined as follows:

1. Usury Class

The "Usury Class" consists of: (a) all persons who paid interest and/or loan charges at any point from July 22, 2016, to (i) Mary M. Wester, individually, (ii) Mary M. Wester, as Trustee of the Mary M. Wester Irrevocable Trust, or (iii) IRA Innovations, LLC (collectively, the "Class Defendants") or against whom the Class Defendants obtained a judgment based upon a loan which provided for the payment of interest and/or loan charges; (b) where the loan is/was governed by Tennessee law; and (c) which interest rate and/or loan charges exceeded the maximum legal rate allowed under Tennessee law.

2. Breach of Contract Class

The "Breach of Contract Class" consists of: (a) all persons who paid interest and/or loan charges at any point from July 22, 2013, to one or more of the Class Defendants, and (b) pursuant to a loan governed by Tennessee law that contained a provision requiring the repayment to maker of any unlawfully excessive interest and/or loan charges.

3. RICO Class

The "RICO Class" consists of: (a) all persons who qualify under the "Usury Class," and (b) who at any point from July 22, 2015, paid interest and/or loan charges at twice the maximum legal statutory rate in the State of Tennessee.

(Doc. No. 66 at 1–2.) These three subclasses correspond to the three "[c]lass claims" the plaintiffs identify: (1) usury and excessive loan charges in violation of Tenn. Code Ann. § 47-14-114; (2) violation of RICO, 18 U.S.C. § 1962(c); and (3) breach of contract. (Doc. No. 67 at 10.) These

claims, in turn, correspond to the SAC's Counts One (usury and excessive loan charges), Two (RICO), and Five (breach of contract).

Rule 23(b)(3)'s requirements are meant "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prods, Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) advisory comm.'s note to 1966 amend.). To that end, the "predominance requirement is generally satisfied 'when adjudication of questions of liability common to the class will achieve economies of time and expense, . . . even if damages are not provable in the aggregate.'" *Pickett*, 140 F.4th at 310 (quoting *Hicks*, 965 F.3d at 460) (omission in *Pickett*). The court will begin and end its analysis with Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement. *Accord Cooper v. NeilMed Pharms., Inc.*, 342 F.R.D. 240, 244 (S.D. Ohio 2022).

A.      **Commonality**

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Moreover, "[c]ommonality drives the initial Rule 23 inquiry. It either establishes the first building block of a proposed class action or exposes an inadequate foundation." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 246 (6th Cir. 2024). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," rather than the mere "violation of the same provision of law." *Doster v. Kendall*, 48 F.4th 608, 612 (6th Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 349–50). The claims must "'depend upon a common contention' whose resolution 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). "That is, 'not every common question . . . will suffice. . . . What we are looking for is a common issue the resolution of which will advance

12

the litigation.'" *Carter v. Paschall Truck Lines, Inc.*, No. 5:18-cv-41-BJB, 2023 WL 359559, at *12 (W.D. Ky. Jan. 23, 2023) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)).

The Sixth Circuit has recently set forth the district court's task in evaluating commonality upon a motion to certify a Rule 23(b)(3) class.

> Step one: check to see that the plaintiffs have identified a common question of law or fact. To be common, a question must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit. The decisionmaker must be able to resolve the question with a yes-or-no answer for the class in one stroke. The district court must actually decide whether the questions are common, meaning that it cannot accept allegations as true or construe evidence in anyone's favor. If a reasonable decisionmaker left with the evidence may answer "yes" to a question for some class members and "no" for others, the class has not shown that it is common.

> Even then, not every question with a common answer meets Rule 23(a). Else, the fact that every customer sued GM about a GM car would create a common question suitable for class certification. The plaintiffs must also show that the question affects at least one disputed element of the class's claims. To conduct a rigorous analysis, the court must walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers.

*Speerly*, 143 F.4th at 316–17 (citations, alterations, and quotation marks omitted). Accordingly, the court begins its rigorous analysis by evaluating the claims at issue.

### 1.    *Count 1 – Usury*

Under Tennessee law, a claim for usury has four elements: "(1) a loan or forbearance, either express or implied; (2) an understanding between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater profit than allowed by law; and (4) an intention to violate the law," the last of which can be inferred from the first three elements. *Porter v. Bull Mountain Dev. Co.*, No. 3:06-cv-1, 2007 WL 128327, at *3 (E.D. Tenn. Jan. 11, 2007) (citing *Jenkins v. Dugger*, 96 F.2d 727, 729 (6th Cir. 1938) (applying Tennessee law)).

13

The plaintiffs assert that a common issue is whether the Class Defendants entered into loans with "Plaintiffs and members of the putative classes." (Doc. No. 125 at 21.)[8] Class Defendant Wester admits that it made loans to Seanache. (Doc. No. 27 ¶ 39.) Class Defendant IRA Innovations has argued, in its Motion to Dismiss, that it is not a lender in the first instance. (Doc. No. 36 at 1–2.) Rather, IRA Innovations argues that it is a "mere passive administrator" that executed non-discretionary buy-orders from its self-directed IRA accountholders, using their funds—akin to a brokerage firm. (*See* Doc. No. 37 at 4–15.) Whether IRA Innovations made loans to the subclass members, therefore, is susceptible to a different kind of proof than whether Wester did. Therefore, whether the Class Defendants made loans to Seanache or other proposed class members is not "of such a nature that it is capable of classwide resolution . . . that determination of its truth or falsity will resolve an issue that is central the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Similarly, determining whether the Class Defendants executed loans that were usurious on their face will require a loan-by loan examination. The court would need to check each promissory note's date and interest rate and then compare that to the maximum rate allowed on that date. The plaintiffs do not explain how such a determination could be anything other than an individualized determination. Second, whether a usury cause of action accrues depends not only on each borrower's promissory note, but also on their payment history. Tennessee usury law provides that "[n]o person shall be entitled to an equitable remedy with respect to usury or excess loan charges unless the person seeking such remedy does equity by paying, or tendering into court, the principal

---

[8] The court notes that, while the "plaintiffs" include both Seanache and Sake, there is no allegation that Sake entered into any loans with any defendant. Thus, the court construes the proposed common question as whether a Class Defendant entered into loans with Seanache or other members of the subclass.

14

plus lawful interest and loan charges then due." Tenn. Code Ann. § 47-15-115(b). Thus, as this court has stated, "the borrower must have paid . . . the principal due on the loan at issue, plus legal interest, before he can collect usurious interest previously paid or seek a judgment that he is not obligated to pay usurious interest." *Int'l Tractor Co. v. Winn*, No. 3:09-0015, 2010 WL 1948256, at *3 (M.D. Tenn. May 13, 2010) (citing Tenn. Code Ann. §§ 47-14-114 and -115, and dismissing the plaintiff/counter-defendants' usury claims where they had not alleged that they had "paid the full principal"). The plaintiffs do not engage with the issue of loan payments and have not responded—by declining to file a reply brief—to the defendants' argument on this point. (*See* Doc. No. 128 at 25–27 (noting that, "it will be necessary to review and analyze, at a minimum, each promissory note and each borrower's payment history").) Third, Tennessee imposes a three-year statute of limitations on usury claims, which runs from the "date of last payment . . . or foreclosure or court action, whichever ensues first." Tenn. Code Ann. § 47-14-118(a). And the law provides the same limitation on actions for excessive loan charges, commitment fees, and brokerage commissions, which runs from the date of payment of the charges, fees, or commissions. *Id.* § 47-14-118(b). Plaintiffs' counsel actually recognizes the need for just such an individualized determination: "Based upon my review of the IRA [Innovations] Sample Production, . . . 8.79% of the sample . . . were time-barred as to the RICO and Usury Classes." (Carnes Decl., Doc. No. 67-3 ¶ 37; *see also* Doc. No. 125 at 5–6 ("Plaintiffs discerned this information by . . . evaluating the corresponding promissory notes (*i.e.*, determining the date of the note to evaluate statute of limitation issues, evaluating if the note was usurious by looking at its interest rate, and determining whether the note contained a usury savings provision).").) The court, therefore, would need to decide not only whether each class member's usury claim was time-barred by looking at the date of the last payment, but also whether each class member's claim for excessive loan charges was

15

time-barred by determining the date of payment of the loan charges. Thus, whether *each* class member paid usurious interest, or loan charges in excess of the law, is not a question capable of class-wide resolution on the same evidence because, as the defendants argue, the evidence regarding each class member's payment history is distinct.

The plaintiffs disagree with the defendants' expert's opinion that the court would need to engage in individualized review of the loans. (Doc. No. 125 at 24 (citing Sharma Rep. at 8–10).) Instead, the plaintiffs argue, "most of [the] determinations [related to usury] are simply mathematical determinations: (1) what was the interest rate in effect at the time of a given promissory note; and (2) did the interest rate on the note exceed that rate[?]" (*Id.*) Answering those two questions requires an individualized assessment and evidence specific to each class member, as the court has discussed. The plaintiffs are correct that "individual damages calculations do not preclude class certification under Rule 23(b)(3)." (Doc. No. 125 at 11–12 (quoting *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 861 (6th Cir. 2013)). But the court would need to conduct an individualized assessment not only to calculate damages, but also to determine liability. *Accord Smith v. First Century Bank*, No. 3:04-cv-591, 2005 WL 1840251, at *8 (E.D. Tenn. Aug. 3, 2005) ("In the court's view, proof of defendants' liability, if any, to a particular class member will hinge on the particular facts of the alleged unauthorized loan, balance transfer or other transaction affecting that particular member and only that particular member."). Put another way, the plaintiffs do not explain how the court could determine whether the borrowers suffered the same injury on a classwide basis. *Cf. Carter*, 2023 WL 359559, at *15 (noting that, in *Castillo v. Bank of Am., NA*, 980 F.3d 723, 731–33 (9th Cir. 2020), the court affirmed the denial of class certification because "whether putative class members were underpaid under purportedly

16

unlawful overtime policy went to liability rather than damages, and putative class failed to 'provide a common method of proving the fact of injury and any liability.'").

However, the court does find that whether, if the Class Defendants have collected usurious interest, they acted unconscionably is susceptible to classwide proof. The SAC alleges that the defendants "engaged in unconscionable conduct" by knowingly charging and collecting usurious interest and that, under Tenn. Code Ann. § 47-14-117, they are entitled to recover twice the amount of interest collected. (SAC ¶ 60.) Indeed, there are distinct remedies for usury, depending on the nature of the offense:

> (b) Where usury or excess loan charges, commitment fees or brokerage commissions do not appear on the face of the contract, but are proved, only the principal, plus lawful interest, loan charges, commitment fees, and brokerage commissions may be recovered.

> (c)(1) Where, however, the court finds that the lender or creditor has been guilty of unconscionable conduct in a transaction by taking interest, loan charges, commitment fees, or brokerage commissions in excess of the limitations fixed by statute, that lender or creditor shall not be entitled to recover any interest, loan charges, commitment fees, or brokerage commissions with respect to that transaction, and shall be required to refund to the borrower or debtor any loan charges, commitment fees, or brokerage commissions, and twice the amount of any interest collected with respect to that transaction, and the borrower shall be entitled to recover reasonable attorneys' fees from the lender.

> (2) As used in this subsection (c), "unconscionable conduct" includes, but is not limited to, any calculated violation of statutory limitations on interest, loan charges, commitment fees, or brokerage commissions with full awareness of those limitations.

Tenn. Code Ann. § 47-14-117.

The plaintiffs allege that the Lender Defendants acted unconscionably in executing promissory notes with usurious terms because they "knew that they were charging interest in violation of Tennessee Law." (SAC ¶ 60.) The SAC alleges a conspiracy by which the defendants, including the Class Defendants, "had a common design, each having the intent and the knowledge of the other's intent, to accomplish by concerted action the unlawful purpose of collecting usurious

interest and excessive loan charges." (*Id.* ¶ 72.) While the court would need to conduct an individualized inquiry to determine whether a given promissory note had terms that were usurious on its face, whether the Class Defendants engaged in "calculated violation[s] of statutory limitations" on interest and loan charges is susceptible to classwide proof. The defendants argue that the plaintiffs have not identified a common question of law or fact. (Doc. No. 128 at 24–27.) But while they identify the purported common question about unconscionable actions (*id.* at 25), the defendants do not explain why it fails the commonality test.

### 2. Count 2 - RICO

The RICO claim is premised on usury. And the "RICO Class" contains the subset of the "Usury Class" who, since July 22, 2015, have "paid interest and/or loan charges at twice the maximum legal statutory rate in the State of Tennessee." (Doc. No. 66 at 2.) Having found that the plaintiffs have identified a common question relevant to the "Usury Class," they have thereby also identified a common question relevant to the "RICO Class."

### 3. Count 5 – Breach of Contract

The elements of a breach of contract claim under Tennessee law are the existence of a contract, nonperformance constituting breach, and damages caused by the breach. *Leedy v. Hickory Ridge, LLC*, 663 S.W.3d 537, 548 (Tenn. Ct. App. 2022) (citing *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The SAC alleges that "[e]ach of the Promissory Notes provides that any unlawfully excessive interest shall be repaid to Seanache." (SAC ¶ 83.) This allegation plainly does not apply to the other putative class members. But the "Breach of Contract Class" consists of borrowers who took out a loan pursuant to a promissory note that had a similar provision applicable to the borrower. (Doc. No. 66 at 2.)

Relevant to the breach of contract claim, the plaintiffs identify one common issue in their discussion of Rule 23(a)(2) commonality: whether the Class Defendants failed to refund usurious

18

interest and fees as the contracts required. (Doc. No. 67 at 10–11; Doc. No. 125 at 11.) The plaintiffs do not explain, in either of their briefs, how determining whether the defendants returned funds to each "Breach of Contract Class" member is susceptible to generalized proof. In their discussion of predominance, however, the plaintiffs identify further questions that "can be determined with generalized proof and extremely limited individualized evidence" relevant to the "Breach of Contract Class." (Doc. No. 125 at 21.) The court will discuss each of these proposed common questions in turn.

First, the plaintiffs identify as a common question "whether Plaintiffs and members of the putative classes entered into one or more loan(s) at a usurious interest rate with one of the Class Defendants." (*Id.*) For the reasons discussed above, this question cannot be answered "yes" or "no" through generalized evidence for the whole subclass. Second, the plaintiffs identify as a common question "whether Plaintiffs and members of the proposed classes paid usurious interest under such a loan to one of the Class Defendants." (*Id.*) For the reasons discussed above, the details of a class member's payment history cannot be answered through generalized evidence.

Third, the plaintiffs identify as a common question "whether the promissory notes . . . contained a usury savings clause." (*Id.*) The proposed subclass contains only those persons who paid interest "pursuant to a loan . . . that contained a provision requiring the repayment to maker of any unlawfully excessive interest." (Doc. No. 66 at 2.) Thus, it is unclear how, for members of the "Breach of Contract Class"—all of whom, by definition, were party to promissory notes that included a usury savings provision—whether their promissory note contained a usury savings provision is a "common issue the resolution of which will advance the litigation." *Sprague*, 133 F.3d at 397. Otherwise, plaintiffs could submit in any motion for class certification as a common

question whether the members of a proposed class have a feature that inclusion in the class requires.

Putting that issue aside, however, and construing the common issue as regarding the court's construction and enforcement of such a provision, "[c]ases involving the interpretation of a form contract are particularly suited for class treatment." *Kopaleishvili v. Uzbek Logistics, Inc.*, No. 1:17-cv-702, 2019 WL 6609212, at *6 (S.D. Ohio Dec. 5, 2019) (internal quotation marks and citation omitted) (collecting cases). The plaintiffs aver that both Wester and IRA Innovations used standardized promissory notes that contained substantively similar usury savings clause provisions. The plaintiffs state that "it appears from the IRA [Innovations] Sample that *many* of these loans are based on various form notes." (Doc. No. 67 at 12 (emphasis added).)  And of the IRA Innovations promissory notes that contained usury savings provisions, their "literal exact language . . . var[ies] in minor ways amongst differing notes," but in a way that "do[es] not defeat commonality." (Doc. No. 125 at 16 n.7.) As to Wester, the plaintiffs state that "[p]ublic records for Mary Wester indicate there are 128 recorded Deeds of Trust in Davidson County alone which are *likely* based on form loans . . . ." (Doc. No. 67 at 9 (emphasis added).) In addition, the plaintiffs state that "[i]t must be acknowledged that Wester utilized form loans." (Doc. No. 125 at 12.) However, the plaintiffs have failed to establish that fact.

The plaintiffs' original brief references "the promissory note . . . for the *only* Mary Wester loan to Seanache for which Plaintiffs have all of the pertinent information." (Doc. No. 67 (citing Doc. No. 67-4 (corrected as Doc. No. 68-1)).) Indeed, the promissory note the plaintiffs cite includes what they refer to as a usury savings provision. (Doc. No. 68-1 at 1–2.) The plaintiffs also state that Wester's counsel agreed to provide them loan documents after the parties filed a protective order. (Doc. No. 67 at 4 n.5.) The plaintiffs further note that, as of the October 2022

20

filing of their brief, they "expect to receive the Wester [promissory] notes and other documents within a few days of filing this Memorandum and will supplement the Memorandum promptly upon receipt." (*Id.* at 5.) Soon thereafter, the court granted the plaintiffs' and Wester's Motion for a Protective Order and Motion to Modify Protective Order. (Doc. Nos. 71, 77.) The plaintiffs' Supplemental Brief, however, does not append any exhibits relevant to loans Wester executed and does not refer to any, other than by references to the Sharma Report and excerpts from Wester's deposition transcript. This, even though, the plaintiffs state, the parties have "engaged in a significant amount of additional discovery pertaining to both liability and certification, including . . . multiple rounds of additional productions from the Class Defendants . . . and additional written discovery conducted by the parties." (Doc. No. 125 at 2.) The plaintiffs further note that the "Supplemental Brief is intended to highlight the additional factual and legal issues that support certification following further development of the record after this discovery." (*Id.*) At this point, however, the plaintiffs appear to have the language of only one promissory note where Wester was the lender. Instead, the plaintiffs rely on Wester's testimony.

The plaintiffs state, "Wester testified . . . that her promissory notes at issue all contained substantially identical clauses requiring her to refund any usurious interest or excess loan charges." (Doc. No. 125 at 14 (citing Wester Dep. 52:7–24).) The plaintiffs have pasted into their brief images of Wester's deposition transcript. (Doc. No. 125 at 13–14.) According to the deposition excerpt the plaintiffs have included in their brief, when asked, "Other than the maturity date – the terms are the same, correct?" Wester answers "I don't' know. I haven't read them enough to compare them." (Doc. No. 125 at 13 (Wester Dep. 48:9–13).) And when asked specifically about the "usury savings provision," Wester responds: "I've never heard the term usury savings until you just mentioned it. I don't understand that." With further prompting, Wester states, "I know

that there is a paragraph in there now that talks about that, and that's what you asked before. And I said yes. I do understand it's in there now." (*Id.* at 14 (Wester Dep. 52:21–24).) Wester's deposition testimony, as represented by the plaintiffs, in combination with one loan document including a usury savings provision, does not show that Wester employed standardized contracts such that the interpretation of their usury savings provision—as the court construes the plaintiffs' proposed common question—is in fact a common question.

Accordingly, the court finds that the plaintiffs have not met their burden to identify a common question relevant to the "Breach of Contract Class." No further analysis is required, and the court will deny the Motion to Certify as it pertains to this subclass. However, because the plaintiffs have at least arguably established the existence of one common question related to the "Usury Class" and "RICO Class," the court will proceed to analyze the predominance requirement as it relates to those subclasses. *Accord Hicks*, 965 F.3d at 458 ("[T]here need be only one common question to certify a class." (quoting *Whirlpool Corp.*, 722 F.3d at 853) (alteration in *Hicks*)).

### B.  Predominance

The plaintiffs seek to certify three subclasses under Rule 23(b)(3). As the Sixth Circuit has stated, the district court's second step, after evaluating commonality, is to evaluate predominance—whether the "common questions 'predominate over any questions affecting only individual members." *Speerly*, 143 F.4th at 317 (quoting Fed. R. Civ. P. 23(b)(3)). To do so, "[t]he court must 'put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates." *Id.* (quoting *Nissan*, 122 F.4th at 252); *see also Fox v. Saginaw Cnty.*, 67 F.4th 284, 300 (6th Cir. 2023) (citing *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)) (noting that the court must "add up all the suit's common issues (those that the court can resolve in a yes-or-no fashion for the class) and all of its individual

issues ‒(those that the court must resolve on an individual-by-individual basis)" and then "qualitatively evaluate which side 'predominates' over the other.")

"Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *In re Am. Med. Sys.*, 75 F.3d at 1084 (citation omitted). That is, "Rule 23(b)(3)'s ‒predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 623–624). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 503 (6th Cir. 2019) (quoting *Wal-Mart*, 654 U.S. at 350 (emphasis and omission in *Wal-Mart*)). Put another way, "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Hicks*, 965 F.3d at 460 (quoting *Young*, 693 F.3d at 544).

Roughly three years passed between the plaintiffs' filing of their Motion to Certify and their Supplemental Brief. During that time, the plaintiffs state, the parties "have engaged in a significant amount of additional discovery pertaining to both liability and certification, including the Class Defendants' production of an expert witness report, multiple rounds of additional productions from the Class Defendants, the Class Defendants' depositions, and additional written discovery conducted by the parties." (Doc. No. 125 at 2.) Moreover, the plaintiffs note, the discovery "has been productive," and the "Supplement Brief is intended to highlight the additional factual and legal issues that support certification following further development of the record after this discovery." (*Id.*) However, the plaintiffs state in their Supplemental Brief, the foregoing

description of productive discovery does not bear on predominance: "[t]here have been no material developments adversely impacting the elements of Rule 23(b)(3) since the additional discovery has been undertaken, and Plaintiffs stand upon and refer to" their original brief. (Doc. No. 125 at 20.)

The plaintiffs swiftly and conclusorily argue that individual considerations would be limited to damages calculations. The court disagrees. Broadly, this case requires each class member to prove, through individualized evidence, that they have paid usurious interest or charges in excess of those permitted. In this case, problems emerge for predominance because "a controlling issue requires individualized determinations ill-equipped for classwide proof." *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1106 (6th Cir. 2022). As the court in *Tarrify* explained: "[e]ven as the claims turn on a question that is easy to understand . . . they require proof that is variable in nature and ripe for variation in application." *Id.* at 1107–08. The plaintiffs describe the questions as common, but the answers to most of the questions the plaintiffs identify as common are not answerable with generalized proof. As discussed above, the plaintiffs assert that "all of the issues which Plaintiffs raise for trial in this case apply to the entire class," though they concede that calculating damages "will require some individual math." (Doc. No. 67 at 10–11.) Thus, with the exception of damages calculations, the plaintiffs argue, common questions of law and fact not only predominate, but are the only questions at issue.

In a certain sense, the plaintiffs are correct that "all of the issues which Plaintiffs raise for trial in this case apply to the entire class." (Doc. No. 67 at 10; *see also id.* at 15 ("[T]he fundamental questions underlying the claims and required proof predominate.").) But really what the plaintiffs have alleged is that the class members were harmed in a similar way and therefore that the questions regarding liability and damages—and the *kind* of proof required to prove their claims —

24

are common to all class members. As the Supreme Court has explained, however, class members' "claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The Plaintiffs are correct when they say that "predominance under Rule 23(b)(3) requires a showing of *questions* common to the class predominate, not that those questions will be answered on the merits in favor of the class." (Doc. No. 67 at 15 (emphasis in original) (citing *In re Whirlpool*, 722 F.3d at 858). But the court must be able to *answer* those questions with generalized proof. And "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Hicks*, 965 F.3d at 460 (quoting *Young*, 693 F.3d at 544). In this case, the plaintiffs merely state that "Plaintiffs will need only submit generalized proof on the issues of liability." (Doc. No. 125 at 20.) It is not clear to the court from the plaintiffs' briefing what the plaintiffs take the "generalized proof" to consist of, or how the court could possibly determine, for example, whether a class member's claim has accrued, or not exceeded the statute of limitations, by reference to generalized evidence.

As the plaintiffs put it, "the fundamental questions underlying the claims and required proof predominate – *i.e.*, whether the remaining Defendants charged usurious interest to the class members; whether the remaining Defendants agreed to repay excessive interest to the class members and failed to do so; and whether such usurious interest violated the RICO statute." (Doc. No. 67 at 15.) And, to answer these common questions, the plaintiffs state, they "will need only submit generalized proof readily capable of being discerned from the remaining Defendants' records." (*Id.* at 16.) Such proof would consist of a list of all persons receiving a loan from the

Class Defendants with an unlawful interest rate and whether the Class Defendant refunded excessive interest. (*Id.* at 17.) The defendants respond that the plaintiffs have not shown predominance. (Doc. No. 128 at 30–36.) The court agrees. The defendants' main argument is that the plaintiffs' contentions that they "need only submit generalized proof on the issues of liability" is not supported by the facts or the law. (*Id.* at 31.) The defendants respond, with specificity, only as to predominance regarding the SAC's usury claim.[9] Thus, the court begins its analysis regarding whether common questions predominate over any questions affecting only individual members of the putative "Usury Class." The defendants put forth four reasons why common questions do not predominate over individualized questions pertaining to the "Usury Class," which the court finds persuasive.

First, the defendants argue that the court must make a choice of law determination for each promissory note because the plaintiffs have not presented evidence showing that all of the notes at issue have a Tennessee choice of law provision. (*Id.* at 32.) As the defendants note, Tennessee usury law governs promissory notes governed by Tennessee law. Based on the pilot production from IRA Innovations, the plaintiffs have stated that "*most* of the class members appear to be Tennessee residents and *most* of the notes appear to be governed by Tennessee law." (Doc. No. 67 at 18 (citing Doc. Nos. 67-2, 67-3) (emphasis added).) Indeed, plaintiffs' counsel has stated, regarding a pilot production from IRA Innovations, that "most of the notes had choice of law provisions that explicitly identified Tennessee law as applicable. In some cases, the notes had no choice of law provisions." (Carnes Decl., Doc. No. 67-3 ¶ 29.) Tennessee applies "*lex loci*

_____

[9] *See* Doc. No. 128 at 31 ("Using Plaintiffs usury claims as an example, it is clear that there are myriad individual issues that need to be resolved with respect to each putative class member's individual promissory note(s)."); *id.* at 31 n.11 ("[The Claim for usury] is only one of 7 total causes of action raised by the Plaintiffs. Similar individual inquiries would be necessary for each of these claims." (footnote omitted)).

*contractus*, which provides that 'a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent.'" *Rubio v. Carreca Enters., Inc.*, 490 F. Supp. 3d 1277, 1283 (M.D. Tenn. 2020) (Richardson, J.) (quoting *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014)). Thus, for those promissory notes without a choice of law provision, this court would need to determine the state in which the loan was executed. In this case, IRA Innovation's accountholders who have executed the promissory notes[10] "are centered in and around the Southeast," and "Tennessee is one of the two states in which IRA maintains a physical office." (Doc. No. 125 at 9.) As the defendants argue, "the southeast" includes a number of states, and in any case IRA Innovations is a national organization and has customers spread over the country. (Doc. No. 128 at 20–21 (citing Doc. No. 128-1, Todd Dep. 19:7–14).)

Complicating matters, the defendants argue that, under Tennessee choice of law jurisprudence, the court "is to apply the law of the state that will lend the greatest validity to the alleged usurious transaction." (Doc. No. 128 at 32 (citing *In re Crabtree*, 48 B.R. 528, 534 (Bankr. E.D. Tenn. 1985)); *see also Bandy v. Roberts*, No. 1:19-cv-164, 2022 WL 3285416, at *9 (E.D. Tenn. Aug. 11, 2022) (quoting *Goodwin Bros. Leasing, Inc.*, 597 S.W.2d 303, 308 (Tenn. 1980)).) In *Crabtree*, at issue was a promissory note without a choice of law provision, where it was plausible that either Tennessee or Kentucky law applied. Because the note was not usurious under Kentucky law, the court applied Kentucky law. *In re Crabtree*, 48 B.R. at 534. Thus, for the promissory notes without a choice of law provision, the court would need to determine where it was executed and, if in Tennessee, whether, under another state's laws that could also control, that other state's law would render the loan not usurious.

---

[10] Whether IRA Innovations is a lender at all was the subject of motion to dismiss briefing, which the court has briefly discussed.

Second, the defendants argue that determining whether a particular loan was usurious under Tennessee law is a "complex, individual inquiry." (Doc. No. 128 at 32.) Relying in part on their expert's report, the defendants describe how the variations among subclass members' loan structures and terms make this exercise particularly complicated. (*Id.* at 34–35 (citing Doc. No. 79-1 at 9–12, 23–30).) Plaintiffs argue that defendant's expert is incorrect. (Doc. No. 125 at 24–25.) But, putting aside the complexities of the structure of each promissory note, the plaintiffs concede that "determination of the interest rate for each note will require minor individualized review of each applicable note." (*Id.* at 24.) In addition, as the court has discussed above, not only would the court need to look at each note to determine its interest rate, it would also need to check the maximum allowable rate at the time to determine whether the note was usurious on its face, as the plaintiffs allege. The foregoing is difficult to square with the plaintiffs' assurance that they "will need only submit generalized proof on the issues of liability." (Doc. No. 125 at 20.)

Third, the defendants argue that, for each class member, the court would need to determine whether a cause of action for usury had accrued. (Doc. No. 128 at 35–36.) Fourth, the defendants argue that, for each class member, the court would need to determine whether their claim is time-barred. (*Id.* at 36.) As the court discussed above, these are not common questions susceptible to generalized proof.

For the foregoing reasons, the court finds that questions common to "Usury Class" members do not predominate over questions affecting individual members.

The "RICO Class" consists of a subset of the "Usury Class": those Usury Class members who, since July 22, 2015, "paid interest or loan charges at twice the maximum legal statutory rate

28

in the State of Tennessee."[11] (Doc. No. 66 at 2.) Plaintiffs' RICO claim alleges a violation of 18 U.S.C. § 1962(c), which prohibits any person from conducting the affairs of an enterprise through the collection of an "unlawful debt," which the RICO statute defines to include debt that is "unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6). That is, "the RICO substantive statute for the collection of an unlawful debt requires the violation of a state or federal usury law." *ITG Brands, LLC v. Yellowstone Cap., LLC*, No. 23-cv-5345 (ER), 2024 WL 4008230, at *10 (S.D.N.Y. Aug. 29, 2024). The plaintiffs do not allege a violation of federal usury law, so their RICO claim depends on their state usury claim. The "RICO Class" consists of those members of the "Usury Class" who paid interest and loan charges at twice the legal rate. The addition of this one factor, alone, does not persuade the court that the questions common to the "RICO Class" members predominate over questions affecting individual members, which are otherwise identical to those affecting "Usury Class" members.

---

[11] The SAC seeks relief related to twenty-two loans, all but one of which, the SAC alleges, "had, on their faces, interest rates that were at least twice as high as the maximum lawful rate." (SAC ¶ 31.) The plaintiffs estimate that there are at least fifty members of the "RICO Class"—eighteen who took out loans from Wester, and thirty-two who took out loans from IRA—based in part on what the plaintiffs state, without citation, is "the stipulation of Wester's counsel." (Doc. No. 125 at 3 & n.2.) The defendants appear to dispute such a stipulation. (*See* Doc. No. 128 at 19 ("Plaintiffs assert, without providing any citation, that [Wester's] counsel stipulated to these numbers during her deposition.").) As the defendants further note, however, the plaintiffs' estimate of the number of members of the "RICO Class" who took out loans from Wester is mathematically impossible. As the plaintiffs define the "RICO Class," it includes all those members of the "Usury Class" who, from July 22, 2015, paid twice the maximum allowable rate. (Doc. No. 66 at 2.) So, there cannot be more members of the "RICO Class" than the "Usury Class." However, the plaintiffs estimate that there are nine members of the "Usury Class," and eighteen members of the "RICO Class," who took out loans from Wester. (Doc. No. 125 at 3.) This estimate cannot be correct.

29

## V. CONCLUSION

For the forgoing reasons, the Motion for Class Certification (Doc. No. 66) will be denied. Further, for the reasons described above, *see supra* note 2, the plaintiffs are on notice that the court will dismiss defendant White for failure to effect timely service of process. Fed. R. Civ. P. 4(m).

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge